IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
December 15, 2010 Session

**BENNIE JOE POTEET, II, individually and by and through Evelyn Poteet,
as conservator of Bennie Joe Poteet, II v. NATIONAL HEALTHCARE OF
CLEVELAND, INC., ET AL.**

**Appeal from the Circuit Court for Bradley County
No. V-07-347     J. Michael Sharp, Judge**

_____

**No. E2009-01978-COA-R3-CV-Filed April 19, 2011**

_____

This appeal involves a claim of medical malpractice. Bennie Joe Poteet, II, individually and by and through his mother, Evelyn Poteet, as his conservator (collectively "the Plaintiffs"), sued Adam E. Fall, M.D. ("Dr. Fall") and National Healthcare of Cleveland, formerly doing business as Cleveland Community Hospital ("the Hospital") (collectively "the Defendants") for medical malpractice after Mr. Poteet suffered a stroke while admitted at the Hospital which rendered him completely paralyzed from the nose down. Both parties moved for partial summary judgment on Mr. Poteet's later added claim of negligence per se based on a bonus incentive plan allegedly maintained by the Hospital that indirectly set forth the reduction of MRIs ordered by Dr. Fall as a factor in his annual bonus determination. The trial court granted the Hospital's dispositive motion on the issue, as well as the Hospital's motion to dismiss on the bonus issue. Prior to trial, the court also granted the Defendants' motions in limine to exclude any evidence of the bonus incentive plan offered to Dr. Fall, but denied the Defendants' motion to exclude all testimony of one of the Plaintiffs' neurology experts. At the close of the case, the trial court submitted a special verdict form to the jury which instructed that the question regarding the Hospital's negligence based on insufficient neurology coverage was to be disregarded if neither Dr. Fall nor the treating nurses were found to be negligent. The jury subsequently returned a verdict favorable to the nurses and Dr. Fall, leaving the question on the adequacy of neurology coverage unaddressed. Judgment was entered on the jury's findings. The Hospital thereafter filed a motion for directed verdict on the neurology coverage issue while the Plaintiffs moved for a new trial on multiple grounds. The trial court denied the Plaintiffs' motion for new trial but granted the Hospital's motion for directed verdict as well as the Defendants' motions for discretionary costs. The Plaintiffs have appealed. We affirm.

**Tenn. R. App. 3 Appeal as of Right; Judgment of the Circuit Court
Affirmed; Case Remanded**

JOHN W. MCCLARTY, J., delivered the opinion of the Court, in which CHARLES D. SUSANO,
JR. and D. MICHAEL SWINEY, JJ., joined.

Michael A. Anderson, Chattanooga, Tennessee, for the appellants, Bennie Joe Poteet, II,
individually and by and through Evelyn Poteet, as conservator of Bennie Joe Poteet, II.

David E. Harrison and Jim K. Petty, Chattanooga, Tennessee, for the appellee, Adam E. Fall,
M.D.

Thomas A. Wiseman, III, Nashville, Tennessee, for the appellee, National Healthcare of
Cleveland, Inc., f/d/b/a Cleveland Community Hospital.

## OPINION

## I. BACKGROUND

Mr. Poteet was arrested on November 2, 2004, in Polk County, Tennessee, for driving
under the influence of alcohol and taken to the Polk County Correctional Facility. The
following day, Mr. Poteet wrote a check to make bond for his release from the jail. The
check subsequently was returned for insufficient funds. A bond revocation hearing was set
for the morning of November 10. After consuming multiple beers during the night prior to
the hearing, Mr. Poteet failed to appear in court, which resulted in bond being revoked and
a capias being issued for his arrest. He was later located by the bonding company, taken to
the Polk County Courthouse, and subsequently returned to the jail later in the day. Mr. Poteet
remained in the jail until the next morning.

At 9:40 a.m. on November 11, Mr. Poteet was observed by other inmates collapsing
to the floor and suffering a seizure. He continued to suffer seizure activity while being
transported by paramedics. At approximately 10:50 a.m., the ambulance carrying Mr. Poteet
arrived at the Hospital. Upon arrival, Mr. Poteet was still unresponsive and "shaking all
over." According to a history provided to the emergency room staff by the paramedics and
a jailer who had accompanied the ambulance to the Hospital, Mr. Poteet had a long history
of alcohol abuse and had gone more than 24 hours without alcohol. The chief complaint was
documented as "seizure." Since Mr. Poteet was still unresponsive, additional medical history
was obtained from records of his prior treatment at the Hospital; the history included bipolar,
depression, DUI, ETOH abuse, headaches, panic disorders, self-mutilation, and several
suicide attempts. Mr. Poteet was initially seen by Hugh Caldwell, M.D., an emergency room

physician who had treated him on previous occasions.

Upon examination, the only sign of any type of injury was a tongue abrasion and/or laceration. There was no evidence of any injury to Mr. Poteet's head, neck, and/or mouth. The emergency room records included the following findings: shaking all over (moving all extremities), loud snoring respirations, groaning, extremely diaphoretic (sweating), postical, decorticate posturing, positive Babinski signs, pupils equal/reactive, and tachycardia. At approximately 10:55 a.m., Mr. Poteet experienced further seizure activity in the emergency room and began vomiting with clenched teeth while still in a comatose-like state. Rapid sequence intubation was performed to protect his airway after vomiting. Mr. Poteet was given medications which rendered him motionless, including Norcuron, Versed, and Ativan, and he was moved to a cardiac area in the emergency room.

Mr. Poteet was placed in soft limb restraints and a CT of the head without contrast was ordered by Dr. Caldwell. The CT was interpreted by radiologist C.A. Kyle, III, M.D., as "negative non-contrast CT of the brain," meaning it was negative for any intracranial hemorrhage or any obvious abnormalities. The Hospital had an MRI machine at this time, which is more sensitive at detecting acute changes in the brain, including intracranial hemorrhage. An MRI also can detect lack of blood flow in the arteries, and possibly the formation for a clot in the vertebral artery. Additionally, the Hospital had the capability to perform a diagnostic catheter angiogram, the best test for seeing blood clots in the vertebra-artery system. The Hospital did not offer interventional radiology; transport to Erlanger Medical Center ("Erlanger") in Chattanooga was required for that procedure.

Upon being returned from radiology to the cardiac area in the emergency room at 12:15 p.m., Mr. Poteet was placed on a monitor. Dr. Caldwell's clinical impression at that time was seizure/comatose. He requested that Dr. Fall, a hospitalist employed by the Hospital, see the patient for admission. Dr. Fall first saw and performed an initial assessment of Mr. Poteet while the patient was still in the emergency room at approximately 12:40 p.m. Dr. Fall's history and physical examination notes reflect that Mr. Poteet's pupils were slightly different in size (anisocoria), with the left pupil being approximately 5 mm and the right pupil being approximately 3 mm. As Mr. Poteet was essentially paralyzed from medication and on a ventilator, it was difficult to perform any other neurological status check at that time; however, Dr. Fall knew that the head CT was negative for any acute bleed (stroke) per the radiologist. A urine drug screen was positive for Benzodiazepines. Dr. Fall's primary diagnosis was status epilepticus (ongoing seizure condition) secondary to alcohol withdrawal. He testified that his differential diagnosis at this time considered the possibility of stroke or interruption of blood supply to the posterior circulation of Mr. Poteet's brain, but he did not feel that such possibility was likely. Dr. Fall's belief that Mr. Poteet had not experienced a stroke was supported by the fact that Mr. Poteet had a negative CT scan, his pupils were

reactive, and he had been seizing (moving his entire body) prior to having been administered Norcuron (paralytic agent given to reduce seizure activity) and a sedation medication. Dr. Fall did not feel any additional diagnostic radiological studies were indicated at that time.

Following his initial evaluation, Dr. Fall requested a neurological consult. The Hospital had arrangements for neurology coverage with Sharon Farber, M.D., a Chattanooga neurologist. In addition to ordering the consult, Dr. Fall called Dr. Farber to discuss Mr. Poteet's condition. After being apprised of the patient's condition and the assessment done in the emergency room, Dr. Farber advised Dr. Fall that she would see Mr. Poteet the next day. Dr. Farber did not suggest that an MRI, additional diagnostic studies, change in medication, or a transfer were indicated.

Subsequently, Mr. Poteet was admitted to the ICU at 1:40 p.m. Dr. Fall's initial written orders included instructions to withhold further Norcuron in order to determine whether further seizures or any focal activities (reactivity of pupils to light) would resume if the paralyzing effect of the medication was removed. He also ordered a consult by John Jaggers, M.D., a Cleveland, Tennessee, critical care and pulmonary specialist with over 25 years of experience in treating critical care patients, including patients who were experiencing strokes and/or alcohol withdrawal seizures.

Dr. Fall examined Mr. Poteet in the ICU at 2:18 p.m. and wrote an addendum to his earlier progress note to document that Mr. Poteet had moved all extremities on suctioning and had continued seizure activity. Based upon the observation of further seizure activity and papillary reactivity to light when Norcuron was withheld, at approximately 3:00 p.m., Dr. Fall resumed the administration of sedation medication to prevent any further seizure activity. At that time, Dr. Fall also ordered the ICU nurses to temporarily interrupt the sedation medication daily at 4:00 a.m.

Dr. Jaggers performed an extensive pulmonary/critical evaluation of Mr. Poteet in the ICU at approximately 8:00 p.m. on November 11. Even though Mr. Poteet's pupils were equal size at the time he saw the patient that evening, Dr. Jaggers testified, and his notes reflect, that he reviewed the hospital chart which included Dr. Fall's notation of the slightly unequal size of Mr. Poteet's pupils. Even though he was fully aware of the earlier finding by Dr. Fall of slightly unequal pupils, Dr. Jaggers did not see any evidence that Mr. Poteet had experienced or was developing a stroke or any interruption of the posterior circulation to the brain. He independently reached the same diagnosis as Dr. Fall – status epilepticus resolved due to alcohol/Xanax withdrawal. Dr. Jaggers did not order an MRI or any other diagnostic study of Mr. Poteet's brain or find that a transfer was indicated. He noted that Mr. Poteet's condition at the time of his lengthy examination and evaluation was "serious, though improved/stable" since the time of his admission.

The ICU nursing assessment notes made during the evening of November 11 did not indicate any change in the patient's neurological assessment. Mr. Poteet remained unresponsive although moving all of his extremities in response to physical stimuli, and his pupils continued to be equal in size and reactive to light. During the following day, periodic neurological assessments by the ICU nursing staff continued to reflect that Mr. Poteet's pupils were equal, round and reactive to light, and that Mr. Poteet continued to move his arms and legs in response to painful stimuli.

Dr. Jaggers saw Mr. Poteet again at approximately 9:40 a.m. the following morning. He noted that Mr. Poteet's pupils remained equal in size and reactive to light. When questioned about the ICU nurses' failure to interrupt the sedation at 4:00 a.m. as ordered by Dr. Fall, Dr. Jaggers noted that he had written the Hospital's ICU policy relative to the sedation interruption protocol which involved the form order that Dr. Fall had signed. Dr. Jaggers indicated that the ICU nurses had discretion whether or not to follow the order under certain circumstances. He further related that his written order on November 12 at 9:40 a.m. directing that the sedation not be suddenly interrupted but instead tapered off superseded and/or negated the sedation interruption protocol order signed by Dr. Fall on November 11.

When Dr. Jaggers saw Mr. Poteet at 9:40 a.m. on November 12, his examination revealed no new findings and no change in the patient's neurological status. When questioned about the notation of the ICU nurses, beginning at approximately 7:00 a.m. on November 12, that Mr. Poteet's pupils were sluggish in reacting to light, Dr. Jaggers stated that this finding indicated that the pupils were still reactive to light (as opposed to non-reactive), which was the most critical indicator of whether there was an interruption to the posterior circulation of the brain. At the conclusion of his visit with Mr. Poteet at 9:40 a.m. on November 12, Dr. Jaggers' diagnosis remained the same: status epilepticus (seizures) secondary to alcohol/Xanax withdrawal. Dr. Jaggers testified that he did not see any evidence of Mr. Poteet experiencing or developing a stroke at the 9:40 a.m., November 12 visit.

Dr. Fall assessed the patient at 10:45 and 11:15 a.m. on November 12, and his opinions regarding Mr. Poteet's diagnosis and condition remained the same. On each occasion, Mr. Poteet's pupils continued to be reactive to light and he moved his extremities upon physical stimuli. At approximately 11:50 a.m., Dr. Fall noted that he had spoken with Mr. Poteet's mother, who advised that her son had a long history of alcohol and Xanax abuse. Dr. Fall also saw Mr. Poteet during the afternoon between 1:40 and 1:45 p.m. His principal diagnosis remained the same: seizures secondary to alcohol withdrawal.

At approximately 2:00 p.m. on November 12, Dr. Farber, a board certified neurologist with 20 years of experience seeing seizure and stroke patients, performed her neurological

examination on Mr. Poteet. As a part of her consultation, Dr. Farber reviewed Mr. Poteet's medical chart, which included Dr. Fall's November 11 notations of slight anisocoria (slight difference in the size of the two pupils). Dr. Farber testified that Mr. Poteet's pupils were reactive during her examination, but she did not document the size of them in her notes. After the consultation, Dr. Farber neither ordered an MRI nor the transfer of Mr. Poteet, and later testified that she did not see any evidence that he had suffered or was developing a stroke. She independently agreed with the diagnosis of seizures secondary to alcohol and Xanax withdrawal made by both Drs. Fall and Jaggers.

At approximately 7:00 a.m. on November 13, the ICU nurses began noting a difference in the size of Mr. Poteet's pupils – the pupils remained sluggish, but still reactive to light. Additionally, Mr. Poteet continued to move his arms/legs in response to painful physical stimuli. At approximately 11:40 a.m., Dr. Marcum, a pulmonologist/critical care specialist who practices with Dr. Jaggers, saw Mr. Poteet in follow-up to his partner's last visit the previous day. Dr. Marcum neither suspected the possibility of stroke or developing stroke nor ordered any further diagnostic studies or the transfer of Mr. Poteet.

Later in the day, at approximately 1:00 p.m., Dr. Fall checked on Mr. Poteet. At that time, the ICU nurses and Dr. Fall observed that one of Mr. Poteet's pupils had become non-reactive, which is the key sign for presence of ischemia or circulation problems to the posterior of the brain (stroke). Dr. Fall ordered a "STAT" CT of the brain. After receiving the report of the radiologist showing that Mr. Poteet had suffered a basilar artery stroke, Dr. Fall ordered that Dr. Farber be contacted immediately. Thomas G. Devlin, M.D., a neurologist and head of the Erlanger Stroke Center, was on call for his partner Dr. Farber and returned Dr. Fall's call at 2:30 p.m. Dr. Devlin consulted with Brent Barrow, M.D., a radiologist at the Hospital, and at 3:15 p.m. ordered a brain MRI. Mr. Poteet was sent for the MRI at 5:30 p.m. After the MRI results revealed a clot in the basilar artery of the brain, it was ordered that Mr. Poteet be transferred to Erlanger. At 8:10 p.m., Mr. Poteet was transferred. Upon arrival at Erlanger, Dr. Devlin ordered an emergency angiogram to determine the precise location of the stroke. Thereafter, Steven Quarfordt, M.D., an interventional radiologist, performed a procedure in which a catheter was inserted into Mr. Poteet's arteries and a clot-busting drug, tPA[1], was administered directly to the blockage. The basilar artery was also expanded with an angioplasty balloon, and the combination of these two treatments resulted in the clearing of the clot.

Although the treatment prevented Mr. Poteet's death, he had suffered catastrophic consequences from the stroke. On November 15, Mr. Poteet was taken off mechanical ventilation and diagnosed with "locked-in" syndrome resulting from the brain stem stroke.

---

[1]Tissue Plasminogen Activator ("tPA") is a thrombolytic agent used to "bust" clots.

Locked-in syndrome is used to describe a patient who is paralyzed from the nose down and cannot speak or move. The patient can see and usually move his eyes, so generally the only form of communication is by blinking or looking up or down for yes and no. Despite the paralysis, the person continues to feel sensation and pain and is entirely aware and conscious. Mr. Poteet currently resides in a nursing home and, like most locked-in patients, requires around-the-clock care.

The Plaintiffs filed suit on April 27, 2007, against Dr. Fall and the Hospital.[2] The complaint alleged that the Defendants were liable for medical malpractice on a number of grounds related to the treatment of Mr. Poteet from November 11-13, 2004.[3] The Hospital filed a motion to dismiss, based on earlier proceedings between the parties in the United States District Court for the Eastern District of Tennessee. After the Plaintiffs filed their response to the motion, the trial court entered an order denying the motion and the Hospital's application for an interlocutory appeal regarding the issue. The trial court noted as follows:

> [T]he Court is of the opinion that issue preclusion is inapplicable in this case because the granting (or denial) of partial summary judgment pursuant to Rule 54(b) Federal Rules of Civil Procedure, is not a final judgment because there was not an express determination that it be a final judgment at the time it was entered and because there was never an entry of judgment adjudicating all the claims and the rights and liabilities of all the parties as required to render it a final judgment in absence of an express determination.
>
> Rule 54.02, Tennessee Rules of Civil Procedure, left the federal partial summary judgment subject to revision in this Court at any time before adjudication of all the claims, depending on the development of evidence.

The trial court therefore determined that "any and all dispositive motions, whether or not previously considered in federal district court, must be filed for consideration in this court

---

[2]The Plaintiffs initially filed the action in federal court on November 10, 2005. The federal district court granted the Hospital's motion for partial summary judgment and dismissed with prejudice all claims against the Hospital, except the claim that the Hospital was vicariously liable for the alleged fault of its employee, Dr. Fall. The order was entered on April 11, 2007.

[3]In regard to Dr. Fall, the Plaintiffs contend that Dr. Fall did not consider the possibility of a stroke on November 11 or 12, despite the presence of clinical evidence consistent with stroke. The Plaintiffs also argue that Dr. Fall should have ordered an MRI examination on November 11, and if an MRI was not available or could not be done in a timely manner, Dr. Fall should have ordered a transfer of Mr. Poteet to a different hospital that could provide the service. The Plaintiffs contend that an MRI would have shown the early stages of the brainstem stroke.

. . . ." Thus, the trial court's order allowed the Plaintiffs to pursue the claims of direct liability against the Hospital.

On March 24, 2008, the Hospital moved for partial summary judgment on the Plaintiffs' claim that the Hospital was negligent in maintaining a bonus incentive plan that provided that Dr. Fall's annual bonus was based, in part, on his success in reducing the number of MRIs ordered. The Hospital also filed a separate motion for summary judgment on all of the Plaintiffs' other claims. Four days later, the Plaintiffs filed their own motion for partial summary judgment on their claim of negligence per se based on the bonus incentive plan. The trial court denied the Hospital's motion for summary judgment by order dated January 21, 2009, but granted the motion for partial summary judgment on the bonus incentive plan. The trial court specifically held as follows:

> 1. The Plaintiffs have not created a genuine issue of material fact on the issue that the bonus proposal that mentioned MRIs and CTs was not implemented and that the proposal went no further than serving as a draft for discussion; and,

> 2. The Plaintiffs have not created a genuine issue of material fact on the issue that Dr. Fall's decision-making during Mr. Poteet's November 11, 2004 admission to the Hospital was based solely on clinical judgment, despite the Plaintiffs' claim that Dr. Fall's decision-making during Mr. Poteet's November 11, 2004 admission to the Hospital was somehow based on the bonus proposal that mentioned MRIs and CTs.

The trial court found that "[t]he Hospital presented admissible evidence that negated the two essential elements regarding the above described bonus claim, and the Plaintiffs failed to present admissible evidence to create a genuine issue of material fact on either issue." The court also granted the Hospital's motion to dismiss the Plaintiffs' claim for punitive damages based on the bonus incentive issue.

Prior to trial, the parties filed numerous motions in limine, on which the trial court entered rulings. In particular, the trial court granted the Defendants' motions in limine to exclude any evidence of the bonus incentive plan offered to Dr. Fall.[4] The trial court denied the Defendants' motion to exclude the testimony of Dr. Patrick Lyden, a neurology expert for the Plaintiffs.

_____

[4]The Plaintiffs made a proffer of evidence on the items excluded by the court.

The jury trial began on March 17, 2009. The testimony covered twelve days.

Dr. Barrow, the local radiologist at the Hospital, testified as follows:

Q If a clot was there, would you more likely than not have seen it had an MRI study been ordered and performed? Again, I'm asking you to assume that the clot was there, okay?

A Okay.

Q In his vertebral artery. If an MRI had been ordered and performed, more likely than not, would it have been detected by the MRI study and read by whatever radiologist?

A Yes.

* * *

Q All right. Based on what you were able to observe or what you reported here that you observed, can you tell me how long that the ischemia or the thrombosis had to have been present in order for it to show up on the CT scan?

A Well, generally six to twelve hours probably at a minimum before you start seeing positive CT findings, three to six hours maybe, depending upon where in the brain, but it's a number of hours. . . .

Q Okay.

A But to give a specific time, cannot.

Q But based on your answer, it sounds likely somewhere between three and twelve hours before the study was done?

* * *

A No. It could be, you know, 24 hours or more.

* * *

-9-

A. Could be within, you know, three to 24 hours from the time he arrived to the first CT scan.

Bernadette DePrez, an employee of the Hospital, testified that she was the Chief Nursing Officer back in November 2004. She acknowledged that there had been discussions on how to make the Hospital more profitable. Further, she admitted that if a patient's pupils were described previously as equal and then later observed to be unequal, such finding should be reported to the attending physician.

Susan Lewis, another employee of the Hospital, worked as a nurse during November 2004, and previously had worked in the ICU. She was designated by the Hospital as its trial representative. She testified that a Joint Commission review of the Hospital in 2004 noted no concern with the level of neurology coverage during that time period.

Janice Beerman, R.N., M.N., testified for the Plaintiffs as a nursing expert:

Q  Does a change in pupil reactivity indicate a change in neurological status to a nurse?

A  Yes, it does.

Q  What is required of a nurse when a nurse observes and charts a change in pupil reactivity?

A  It requires that the nurse notify the physician of the change.

* * *

Q  At 7:00 a.m. on November 12th, 2004, was a change in Mr. Poteet's pupil size documented by the nurse that made the observation on this chart at 7:00 a.m., on November 12, 2004?

A  Yes.

* * *

Q  What should a nurse do when she notes that change?

A  Notify a physician.

-10-

Q Did you see any entry in this record of where a nurse notified a physician at 7:00 a.m. on November 12th that a change had been documented at that time?

A I did not.

Q Let me also ask you about the entries for pupil reaction, Ms. Beerman. The first entry on November 12, 2004, is something other than normal, isn't it?

A Correct.

Q And what is the entry with respect to Mr. Poteet's pupil reaction at 7:00 a.m. on November 12?

A The nurse has documented that now the pupils are sluggish and not normal.

Q From a nurse's perspective, is a change in pupil reaction from normal to sluggish a change in neurological status?

A It could be.

Q Do you see any evidence in the record that any nurse notified any physician of the documentation of that change in neurological status at 7:00 a.m. on November 12th?

A No.

Ms. Beerman noted that the entries made throughout the remainder of the day indicated that Mr. Poteet's pupil size remained at two and sluggish. At 5:00 p.m., the pupils enlarged slightly up to a three and sluggish. She again found no evidence that the nurses contacted any of the doctors about the change.

As to charting from November 13th, Ms. Beerman noted:

Q Do you see at 7:00 a.m. on November 13, 2004, what the charting was for the sizes of Mr. Poteet's pupils at 7:00 a.m., on November 13, 2004?

A His pupil size has now changed from the left to the right, the left being greater than the right, and the left being larger than the assessment through the night. It is now rated at a four.

-11-

Q From a nursing perspective, is that documentation and notation evidence of a change in neurological status?

A Yes.

Q In your review of this record, did you see any entry in the record that a nurse notified any doctor or Dr. Fall of the change in the neurological status of Mr. Poteet at 7:00 a.m., on November 13th?

A I did not.

According to Ms. Beerman's review of the record, the reactivity of Mr. Poteet's pupils remained sluggish throughout this time. She observed that later in the day, the left pupil went up to a four and the right pupil down to a 2. At 1:00 p.m., the left pupil was charted as nonreactive. This was the time Dr. Fall apparently arrived at the patient's room. Ms. Beerman further stressed the fact that no nurse ever interrupted Mr. Poteet's sedation at 4:00 a.m. on November the 12 per the physician's standing order. She declared that the actions of the nurses constituted "a breach of the standard of nursing care."

Gary A. Salzman, M.D., the Plaintiffs' medical expert, testified as follows:

Q Do you have an opinion of whether Dr. Fall's failure [to] follow up on the unequal pupils and consider stroke was a breach of the standard of care that was owed to Mr. Poteet?

A Yes. I believe that was a breach of the standard of care not to suspect a stroke when you've seen unequal pupils in this patient in the intensive care unit.

* * *

Q Doctor, do you have an opinion, to a reasonable degree of medical certainty, of what Dr. Fall should have done on November 12, 2004, once either the nurses reported to him the pupils were sluggish or he made that observation himself if he had done it?

A There is another clue to solving this mystery. We have on the 11th, he's got unequal pupils. Now he's seeing that they're sluggish pupils. I think that's another clue that this could be an interruption of blood flow to the back part

-12-

of the brain. He needs to either order an MRI to see whether there's a stroke developing or to transfer to a stroke center to figure out what's wrong with this man to try to make him better.

\* \* \*

Q . . . Do you believe that Dr. Fall, under the standard of care, had a duty to make himself aware whether the nurses reported to him or not during the morning hours of November 13, 2004, what the status of Mr. Poteet's pupils were?

A Yes. Dr. Fall had a duty to assess the pupils and the size and reactivity of the pupils on the 13th.

\* \* \*

Q Dr. Salzman, do you have an opinion, to a reasonable degree of medical certainty, whether Mr. Poteet should have been transferred to a stroke center as soon as possible once the pupil was noted to be nonreactive and the pupillary change was 2-millimeters?

A Yes.

\* \* \*

Q Okay. In your professional opinion, Doctor, and in connection with your review of Mr. Poteet's chart and based on your education and experience, do you have an opinion to a reasonable degree of medical certainty whether Mr. Poteet was showing early signs and symptoms of some interruption of the blood flow to his brain as early as November 11, 2004?

A Yes. The unequal pupils Dr. Fall saw was a clue that there was an interruption of blood flow to the brain. And that clue needed to be acted upon aggressively and advocate for the patient to get him to a place where they could treat him and open up the blood flow to his brain.

\* \* \*

Q Do you have an opinion, to a reasonable degree of medical certainty based upon your expertise and experience, whether Mr. Poteet's outcome would have

-13-

been considerably better had an order been made for his transfer as of 7 a.m. on November 13, 2004?

\* \* \*

A  I believe on the 13th if Mr. Poteet was transferred, I believe it's likely he would have had some neurological injury, some double vision, some dizziness, some deficits, but I believe he would not have been in a locked-in syndrome if he was transported in the morning of November 13th.

\* \* \*

Q . . . Did you see anything in your review of Mr. Poteet's chart that indicated that he had any abnormalities in his heart that might cause a clot to form?

A  No.  His EKG showed a sinus rhythm. . . .

\* \* \*

On cross-examination, Dr. Salzman admitted that he was not a specialist in neurology or stroke treatment.  He further testified:

Q  Now, what caused this small clot to stick to the side of the left vertebral artery or the basilar artery?

A  I believe it would start in the left vertebral artery and was related to twisting of the neck and tearing of the vessel or dissection which caused a narrowing of the vessels and clotting.

\* \* \*

Q . . . So twisting of the neck.  Now when was Mr. Poteet's neck twisted in a manner that caused a dissection of his either left vertebral artery or his basilar artery?

A  It could have been when he was having a seizure.  It could have been when they were putting the tube in his throat.  It could have been any time during those time periods.

\* \* \*

-14-

Q  Now, you agree that not a single one of the radiologists, neuroradiologists or neurologists who provided care to Mr. Poteet reported on any imaging studies or the reports of the embolization procedure saw a dissection in either his left vertebral artery or his basilar artery, correct?

A  Correct.

Q  You do not believe, based on your expertise, that the clot that caused Mr. Poteet's stroke was a traveling clot?  In other words, a clot coming from somewhere else in the arterial system that was of sufficient size that when it reached a point where it could no longer pass through the artery and got stuck. You don't believe that's the cause of the stroke, right?

A  I don't believe it was an emboli.  I believe it was a thrombus that started right there inside the brain.

* * *

Q  So would you explain to us . . . why this clot here in this area of dissection that occurred at 9:40 or 11:00 a.m. and caused these changes in pupil size resulted in the pupils then going back to equal, just another hour later or two hours later or three hours later or four hours, whenever they are looked at, explain to us the physiology of that, please.

A  There wasn't a complete occlusion on the 11th.  It was partially occluded. So there was an interruption of blood flow.  That interruption did affect pupillary response for a while.  Then the blood flow picked up and was enough to have normal pupillary response until the end of the 11th.  But then by the 12th, then we have a decrease in blood flow, now we have sluggish pupils. and by the 13th, we now have complete occlusion and we've got nonreactive pupils.

* * *

A  . . . This is called a stuttering stroke that you're going to have some partial obstruction, you're going to have limitation of blood flow.  Then the blood gets around that area and you get blood flow.  So you're going to have intermittent decreases in blood flow to the brain until eventually on the 13th, you've got complete blockage of blood flow.

-15-

Dr. Jaggers, the pulmonary critical care specialist from the Hospital, testified as follows:

Q  By 8:00 p.m. on November 11th, 2004, did you see any sign or symptom consistent with a stroke in this gentleman?

A  No.

* * *

Q  . . . And what did you document regarding whether his pupils were of a certain size and whether they were reactive to light at 8:00 p.m., November 11th, 2004?

A  It says pupils are equally round and reactive to light at this time.

* * *

Q  . . . You were aware that there had been a reference to possible anisocoria earlier. You did your own examination. When you looked at this gentleman's eyes that night, his pupils . . . did you have any concerns that there were abnormal findings through his pupils at that time?

A  No.

* * *

Q  And after you dictated this note on the evening of November 11th, 2004, if you thought this patient should have an MRI, a CT, or be transferred, could you have ordered those things?

A  Yes.

Q  Why didn't you order those things?

A  They were not indicated.

* * *

Q  . . . Did you examine this gentleman's eyes on the morning of November

12th, 2004?

A  Yes.

* * *

Q  Okay.  Did you find any abnormalities to indicate to you this patient had had a neurological status change by 9:40, the morning of the 12th, based on your examination of his eyes?

A  No. . . . [N]o new changes, no new findings.

* * *

Q  Dr. Jaggers, if a nurse had called you on the morning of November 12th and told you . . . this patient's pupils are sluggish in their reaction to light, would you have thought that was a neurological status change?

A  No.

Q  What are the terms you use to describe pupils and how they react to light?

A  They react or they don't react.

* * *

Q  By the time you saw this gentleman at 9:40 in the morning of November 12th, had you seen a single sign or symptom consistent with stroke?

A  No.

* * *

Q  Dr. Jaggers, based on your two days of involvement with this gentleman, . . . had you seen a single sign or symptom to make you think this gentleman had had a stroke?

A  No.

* * *

On cross, Dr. Jaggers was asked the following:

Q  Did you check to see whether he could . . .  he was moving his extremities when you examined him?

A  Yes.

Q  And was he or was he not?

A  He was.

Q  Was he – how many of his extremities was he moving?

* * *

A  He was moving all – yeah, he moved all four extremities.

Q  Could you tell us whether the movement of all four extremities is consistent or inconsistent with a stroke?

A  Well, the movement of all four extremities equally, as his were doing, meant that he didn't have any type of motor stroke.

* * *

Additionally, Dr. Jaggers indicated that pupil sizes can vary at times, particularly in patients who are under sedation, and are not necessarily an indication to suspect a stroke or developing stroke.  He observed that there was no reason to order an MRI or the transfer of Mr. Poteet prior to the events of November 13.

Dr. Farber, the consulting board-certified neurologist with 20 years of experience seeing seizure patients, testified that she did not see any evidence that Mr. Poteet had suffered or was developing a stroke and independently agreed with the diagnosis of seizures secondary to alcohol withdrawal.  She stated specifically as follows:

Q  . . .  If you felt the patient needed to be transferred, either you would have worked to get that transfer done or talked to Dr. Fall about having him do it,

-18-

as the attending, correct?

A  Yes.

* * *

Q  . . . [W]as it necessary for an MRI to be ordered reflected on the notes? . . .

A  When someone comes in with an acute seizure or an acute neurological injury, you usually do a CAT scan to make sure there's no bleeding, there's nothing acute.  You don't always do an MRI.  I'm an old-fashioned doctor, so I probably do less MRIs than some of the younger ones.  But later on, it might have been done as part of the seizure workup, but if you've got a guy on the ventilator with half a dozen IVs going, it's very hard to get him safely in – you have to take him out of the unit, you have to stop the IVs and stop the medicine he's getting, and in some hospitals you can't bring the tub – the vent machine in.  You have to have someone in there, breathing for them.  You have the possibility of everything coming out.  It's risky to the patient to take them for an MRI if it's not really needed, and so I often don't get them, unless they're really needed, in an ICU patient.

Q  And that's why one was not ordered at that time, correct?

A  Also, there was nothing to indicate stroke or tumor.

* * *

Q  Is tPA generally effective to treat a brainstem stroke?

A  tPA is minimally effective for any kind of stroke.

Q  And when you say minimally, what percentage effective is it?

A  If you give tPA within three hours to people with a stroke, on the average, one in eight does better than they would have without it.

Q  And if you give it to a big stroke - -

* * *

A  And if you give it to a big stroke, very few get better, like 5 percent.

Q  Has tPA been shown to be effective after three hours, post-stroke?

A  Intravenous, no.  No.  It causes more bleeding.  In cases of posterior brainstem strokes, there's an experimental use of tPA up to 12 or sometimes more hours afterwards, but it's not standard of care.  It's not even probably approved.

Upon reviewing Dr. Farber's notes, Dr. Devlin, testified that he saw no evidence that Mr. Poteet had suffered or was developing a stroke when the patient was seen by his colleague on November 12.  He further noted as follows:

A  . . . At Cleveland Community Hospital, they saw changes in his brainstem on a CAT scan, and that's what triggered them to do the MRI scan.  You almost never see changes on a CAT scan, particularly in the brainstem, less than three hours.  I've never seen that.

Q  That would suggest to you that the stroke was older than three hours when the CT scan was performed on November the 13th?

A  With greater than 95 percent certainty.

* * *

A  . . .  I can tell you many patients, of young patients, who come in here unconscious.  We think it's a drug overdose, but we do a CT angiogram, which [other hospitals do not do].  . . . .

* * *

A  . . .  [P]atients come in, they think there's no neurology problem, they think it's a drug overdose, and on the CTA there's an occluded basilar artery, so they call us up and we treat the patient and the patient does well.

I can show you those cases, but one, *that's not standard of care*, and it's – and *the vast majority of patients that present with vertebral basilar problems, like 90 percent plus, go undiagnosed in the first three-hour window*.

-20-

*It's very difficult to assess those patients clinically, particularly if they present with something like a seizure or you think, in fact, the patients has a seizure, and then of course they're going to be unconscious for a long period of time.*

(Emphasis added). Dr. Devlin opined that the first indication Mr. Poteet was experiencing or developing a stroke was at approximately 1:00 p.m. on November 13.

Alfred Callahan, M.D., a stroke expert from Nashville, testified as follows:

Q Did Mr. Poteet have a big stroke?

A He had a huge stroke.

Q Was Mr. Poteet even eligible for IV tPA, even assuming that therapy was available?

A No.

* * *

Q . . . [T]ell the jury why seizures are not evidence of Mr. Poteet having a brain stroke at that time.

A Well, you can have a seizure with a stroke . . . . It's only the outside of the brain, the cortex, that causes seizures. . . . [I]f he had a brain stem stroke, where he didn't have connections between the cortex and the limbs, he wouldn't be able to make his limbs move in seizure activity. . . .

* * *

Q In your opinion, was Mr. Poteet having alcohol withdrawal seizures when he had his episode at the jail and then was taken to the emergency department?

A I think that's the best bet . . . .

* * *

Q And was there any clinical evidence, during his time in the emergency

-21-

department, to indicate to you that Mr. Poteet was having a brain stroke instead of seizures due to withdrawals, either from alcohol or Xanax or both?

A  No.  It looked to me like he was just having generalized seizures because of a presumed withdrawal.

* * *

Q  . . . And in terms of when that stroke occurred, sir, do you have an opinion, to a reasonable degree of medical probability, when that stroke happened?

A  . . . I'm certain that he had it on the 13th.  But when he had it on the 13th, I don't know the exact time.

* * *

Q  What type of stroke did Mr. Poteet have on November 13, 2004, to a reasonable degree of medical probability?

A  He had a cerebral embolus, which is a traveling clot.

* * *

A  Well, medically, we call it an embolus, because it's easier to say that than traveling clot.  But a clot began in the – probably arterial side of the circulation, and had to then – it moved, wherever it came from, I don't know where it came from, or even why it started, but it did, and then it travels, it moves along with blood.  And it only gets to go so far, because of its size, and it goes as far as it can go, and then it gets arrested.  It plugs something and stops up an artery. . . .

* * *

A  There's no evidence of a tear, of an atherosclerotic plaque or a normal blood vessel, which we call dissection.

And it's very, very classic when you have this appearance of a big plug completely blocking, occluding, as we say, the top portion of the basilar artery, that that was a traveling clot, that was an embolus. . . .  Big clots are made by big arteries.  So it came probably somewhere in his arterial circulation, and we

-22-

normally call that great vessels, down near the aorta. . . .

* * *

Q . . . Based upon your review of all the materials in the case, . . . do you have an opinion as to whether any healthcare provider at Cleveland Community Hospital, and in particular Dr. Fall and the nursing staff, could have or should have done anything differently that could have prevented this top-of-the-basilar clot in Mr. Poteet's posterior circulation?

A I believe there was nothing that could have been done.

Q And do you believe – in your opinion, was there anything that Dr. Fall or the nursing staff at Cleveland Community Hospital, or any other physician there, could have or should have done that would have avoided, in terms of probabilities, either death or significant neurological damage, like locked-in syndrome, once Mr. Poteet had that clot in the top of his basilar . . . ?

A No. I consider these cases hopeless with our present technology, and with all that we did in 2004.


David Uskovitch, M.D., a neurologist and Director of General Neurology at Vanderbilt, testified that he saw no evidence on the imaging studies of vertebral dissection anywhere in Mr. Poteet's posterior circulation. He stated that the actions of Dr. Fall and the nurses did not cause the seizure activity, the clot to form and travel, the basilar artery stroke to occur, or the outcome suffered by Mr. Poteet. He opined that mild pupillary changes occur "all the time in ICU patients" because of the medical conditions and the medications being received. Dr. Uskavitch testified as follows:

A In my opinion, the stroke was caused by an acute embolism, a traveling blood clot to the top of the basilar artery at approximately midday on November 13.

That process, that acute process led to the abrupt change in his pupils and then a progressive decline in his neurologic function, where he lost motor function going forward.

The fact that the clot was sitting there at the top of the basilar artery then led to propagation of thrombus up the posterior cerebral arteries to the back of the

head and then down the basilar arteries to the top of the vertebral arteries, and so the whole system ended up with clot.

Q   Have you seen any evidence in this case, in a radiology report or any imaging, MRA, angiography, or arteriography that this gentleman had either a dissection or some other type of lesion in the lining of the wall of either a vertebral artery or his basilar artery?

A   There is no evidence of that.

Q   . . . [T]ell us what evidence there is in this case to support a theory that clots would come up and just stop, just stick to the side of the wall, as opposed to proceeding to the top of the basilar.

A   There is no evidence.

Q   Is there any evidence in this case that this gentleman had atherosclerosis somewhere in a vertebral artery or basilar artery to cause a narrowing to support a theory of stroke in evolution as opposed to an acute embolic event?

A   There is no evidence in this case for that theory.


Dr. Uskovitch specifically noted that there was no indication of a stroke or developing stroke before Dr. Fall reached such diagnosis at approximately 1:00 p.m. on November 13.  He testified that

> [a]t that point in time, I would say that there was occlusion at the top of the basilar artery to the blood that gets to the upper part of the midbrain, hence the pupil change.  And then from that point forward, there was thrombus forming above in the two posterior cerebral arteries and then all the way back down the basilar artery, to the distal portion of the vertebral arteries.
>
> Q   Which resulted in a total occlusion of the basilar artery?
>
> A   Correct.  The whole system clotted.
>
> Q   And the basilar artery is the artery of life?
>
> A   Yes.

-24-

He further indicated that the neurologic deficits on November 11 and 12 were attributable to the presentation of status epilepticus, recurrent seizures. Thus, the signs could be directly attributable to someone who has had a series of convulsions from alcohol withdrawal. He admitted, however, that these signs can be starting and stopping progressive vertebrobasilar artery stroke.

Dr. Fall testified as follows:

Q Do you disagree that a stroke should be considered in any patient presenting to the hospital with acute neurological deficit?

A When Mr. Poteet presented to the hospital, he had seizures, and on my examination of him, I did not feel that he had any evidence of a stroke.

* * *

A When I first saw Mr. Poteet, he had . . . recently received a medicine that caused his paralysis for a short time. Prior to that, he was seizing. He was moving all of his extremities. That would suggest he did not have a stroke, if he could move all of his extremities during a seizure. If you have a stroke, that's the problem, you're not going to move part of your body . . . . He was moving his entire body.

* * *

Q You do not believe that Mr. Poteet suffered a stroke, an infarction on November 12th, correct?

A That's correct.

Q You believe he had a stroke on November the 13th?

A Yes, sir.

* * *

Q Never considered ischemia, or an interruption of blood flow, to Mr. Poteet's brain on November 11th, 2004, did you?

A I did not think, based on his signs and symptoms, that he had that, so those

-25-

things tick through your brain, could it be this, but based on his signs and symptoms, I did not think he had that.

Q  Did you consider stroke or ischemia or an interruption of blood flow to Mr. Poteet's brain on November 11th, 2004?

A  Any time you're presented with a comatose patient that has a seizure, things go through your mind.  Based on him moving all his extremities, what the ER documented, it did not appear to me that he had had a stroke.  Plus, he had had a CAT scan that showed everything was okay.

\* \* \*

A  . . . [W]e're looking for signs and symptoms.  He's moving all of his extremities.  Later, when he got to the ICU, on suctioning, on nursing care, he's moving all of his extremities.  That does not suggest that he's having interruption of blood flow.

\* \* \*

A  Based on his physical exam, both when he first came to the emergency room, and then later in the ICU, and throughout his course, there was nothing indicating he had ischemia, in my opinion, until the 13th.

Dr. Fall further testified:

Q  Do you have any reason to believe, or did you have any reason to believe in November of 2004, that if Mr. Poteet had been sent to the Erlanger Stroke Center, that those doctors would not have treated Mr. Poteet, would not have intervened?

A  On November 11th –

\* \* \*

A  It's my opinion that November 11th or 12th, that they would have not intervened, because there was nothing to do.

\* \* \*

Q  Okay.  Dr. Fall, will you please tell the jury what the standard of care was that doctors were required to meet in Bradley County, Tennessee, in November of 2004?

A  I think the standard of care was to evaluate the patient, treat them, based on their evaluation, and monitor them while they were in the hospital, and adjust your treatment as things progressed or changed.

Mark Williams, M.D., a hospitalist who practiced in Atlanta and Cartersville, Georgia – a community similar to Cleveland, Tennessee in 2004 – testified (1) that the standard of care relative to the medical treatment of Mr. Poteet given his presenting condition was to control the seizures, monitor the patient, and make adjustments as Mr. Poteet's condition changed for better or worse, and (2) that such standards were followed by Dr. Fall.  He noted that Dr. Fall delivered "very good, high-quality care" to Mr. Poteet and met and exceeded the standard of care of a hospitalist in his care, management, and treatment of the patient.

At the trial's close, the court denied all parties' motions for directed verdict, finding that the issues should go to the jury.  The jury found that the nurses breached the standard of care, but determined that this breach did not cause Mr. Poteet's injury.  The jury next concluded that Dr. Fall was not negligent.  A question regarding insufficient neurology coverage by the Hospital was also included on the verdict form.  However, the jury was instructed not to answer the question if it found neither Dr. Fall nor the nurses negligent; therefore, the jury did not decide that issue.  Specifically, the verdict form provided as follows:

We, the jury, make the following answers to the questions submitted by the Court:

1.      Do you find from the preponderance of the evidence that the hospital nurses deviated from the standard of care applicable to them in their care and treatment of Mr. Poteet?

Response:  Yes.

2.      Do you find from the preponderance of the evidence that the hospital nurses' deviation from the standard of care proximately caused injury to Mr. Poteet that otherwise would not have occurred?

Response: No.

3.      Do you find from the preponderance of the evidence that Dr. Fall deviated from the standard of care applicable to him in his care and treatment of Mr. Poteet?

Response: No.

Judgment was subsequently entered on the jury's verdict on May 14, 2009. Approximately a month later, the Hospital filed a motion for directed verdict on the neurology coverage issue. The Plaintiffs moved for a new trial the same day on multiple grounds, all of which are included as current issues to be resolved in this appeal. In a September 10, 2009 order, the trial court denied the Plaintiffs' motion for a new trial and granted the Hospital's motion for a directed verdict. The court also granted the Defendants' motions for discretionary costs. The Plaintiffs filed a timely notice of appeal.

## II. ISSUES

The Plaintiffs raise the following issues:

1. Whether the trial court erred in granting the Hospital's motion for partial summary judgment on claims concerning a bonus incentive plan offered to Dr. Fall and/or whether the trial court erred in excluding evidence concerning the offering of such proposed bonus incentive plan to Dr. Fall.

2. Whether the trial court correctly held that Tenn. Code Ann. § 29-26-115(a) and (b) precluded portions of the testimony of the Plaintiffs' neurology expert, Dr. Lyden.

3. Whether the jury verdict form was confusing, inconsistent with the trial court's instructions, and drafted improperly such that the jury did not answer the question about the Hospital's alleged liability for failing to have adequate neurology coverage.

4. Whether the trial court erred in granting the Hospital's motion for directed verdict on the issue of its alleged negligence for failing to provide adequate neurology coverage.

5. Whether the jury's finding regarding the Hospital's nurses was supported

-28-

by material evidence.

6. Whether the jury's finding regarding Dr. Fall was supported by material evidence.

7. Whether the trial court appropriately exercised its function as thirteenth juror when considering the Plaintiffs' motion for new trial.

8. Whether the trial court erred in awarding discretionary costs to the Hospital and Dr. Fall.

## III. DISCUSSION

### A.

#### 1.

The Plaintiffs contend that in granting the Hospital's motion for partial summary judgment on the bonus incentive issue due to the lack of "evidence that the proposal had ever been accepted by Dr. Fall and/or adopted in writing as required by the contract between the Hospital and Dr. Fall" and therefore had not been implemented, the trial court incorrectly applied the summary judgment standard. As a result of the court's ruling, no proof was allowed at trial regarding the bonus incentive issue.

Tenn. R. Civ. P. 56.04 provides that summary judgment is appropriate where: (1) there is no genuine issue with regard to the material facts relevant to the claim or defense contained in the motion, *see Byrd v. Hall*, 847 S.W.2d 208, 210 (Tenn. 1993); and (2) the moving party is entitled to judgment as a matter of law on the undisputed facts. *See Anderson v. Standard Register Co.*, 857 S.W.2d 555, 559 (Tenn. 1993).

In *Hannan v. Alltel Publ'g Co.*, 270 S.W.3d 1 (Tenn. 2008), the Tennessee Supreme Court clarified the moving party's burden of proof in a summary judgment motion. A moving party who seeks to shift the burden of production to the nonmoving party who bears the burden of proof at trial must either: (1) affirmatively negate an essential element of the nonmoving party's claim; or (2) show that the nonmoving party cannot prove an essential element of the claim at trial. *Id.* at 5. According to the Court, when a party seeking summary judgment has made a properly supported motion, the burden shifts to the nonmoving party to set forth specific facts establishing the existence of disputed, material facts which must be resolved by the trier of fact. *Id.*; *see Byrd*, 847 S.W.2d at 215; *Robinson v. Omer*, 952 S.W.2d

423, 426 (Tenn. 1997). The nonmoving party may not simply rest upon the pleadings, but must offer proof by affidavits or other discovery materials (depositions, answers to interrogatories, and admissions on file) to show that there is a genuine issue for trial. If the nonmoving party does not so respond, then summary judgment, if appropriate, shall be entered against the nonmoving party. Tenn. R. Civ. P. 56.06.

There is no presumption of correctness for summary judgments on appeal. *See City of Tullahoma v. Bedford County*, 938 S.W.2d 408, 412 (Tenn. 1997). This court must view all of the evidence in the light most favorable to the non-movant and resolve all factual inferences in the non-movant's favor. *Luther v. Compton*, 5 S.W.3d 635,639 (Tenn. 1999); *Muhlheim v. Knox County Bd. of Educ.*, 2 S.W.3d 927, 929 (Tenn. 1999). When the undisputed facts, however, support only one conclusion, then the moving party is entitled to judgment as a matter of law and a summary judgment will be upheld. *See White v. Lawrence*, 975 S.W.2d 525, 529 (Tenn. 1998); *McCall v. Wilder*, 913 S.W.2d 150, 153 (Tenn. 1995).

When the decision of the trial court to exclude evidence is based on the relevance of the proffered evidence under Tenn. R. Evid. 401, 402, and 403, the standard of appellate review is "abuse of discretion." *State v. Coulter*, 67 S.W.3d 3, 47 (Tenn. Crim. App. 2001). Applying this standard, "trial courts are accorded a wide degree of latitude in their determination of whether to admit or exclude evidence, even if such evidence would be relevant." *Dickey v. McCord*, 63 S.W.3d 714, 723 (Tenn. Ct. App. 2001). Our Supreme Court has stated in discussing the abuse of discretion standard that "a trial court abuses its discretion only when it 'applie[s] an incorrect legal standard, or reache[s] a decision which is against logic or reasoning that cause[s] an injustice to the party complaining.'" *Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001). Under this standard, a trial court's ruling "will be upheld as long as reasonable minds can disagree as to [the] propriety of the decision made," and the appellate court is not permitted to "substitute its judgment for that of the trial court." *Id.*

As the Plaintiffs have pointed out, "[i]t is not enough for the moving party to challenge the nonmoving party to 'put up or shut up.'" *Hannan*, 270 S.W.3d at 8. Instead, to shift the burden of production back to the non-moving Plaintiffs, it was the initial burden of the Hospital as the moving party to "affirmatively negate an essential element of the nonmoving party's claim; or show that the nonmoving party cannot prove an essential element of the claim at trial." *Id*. at 5. Here the element at issue was whether the proposed bonus incentive plan had ever actually been implemented. The Hospital submitted an affidavit by a hospital administrator testifying that the plan had never been instituted. While this evidence may have been sufficient to satisfy the Hospital's initial burden under either or both of the above summary judgment alternative standards, we must depart from the trial court's conclusion that this evidence was wholly unrebutted to establish that the "bonus

program was never implemented" for summary judgment purposes.

The Plaintiffs provided several forms of indirect or circumstantial evidence of the plan's implementation, including the fact that the bonus incentive document was in Dr. Fall's personnel file, it was provided to Dr. Fall pursuant to the terms of his executed employment agreement with the Hospital, there were no other documents in his personnel file with bonus incentive criteria, and there were no documents rejecting or amending the bonus incentive document. The employment contract provided that Dr. Fall "shall receive Incentive Compensation" if established goals set out in a separate writing were met; the bonus incentive plan offered exactly the referenced 10% bonus and tracks exactly the bulleted criteria contained in the employment contract. Additionally, Dr. Fall actually received bonuses from the hospital and the bonus incentive plan was the only written document in his file that set out the written criteria required to receive the incentive compensation. It was not marked "Draft" and it did not contain any other revisions or replacement incentive criteria. Indeed, the Hospital did not provide any documentation suggesting any rejection or amendment to the bonus incentive criteria. Accordingly, viewing the evidence and drawing all reasonable inferences in the light most favorable to the Plaintiffs as the nonmoving party, we conclude that a genuine issue of material fact remained regarding whether the bonus incentive plan had been implemented sufficient to survive the motion for partial summary judgment.

The Plaintiffs also assert that a genuine issue of material fact existed as to the other ground set forth by the trial court for granting the Hospital's partial summary judgment on the incentive plan issue – whether the bonus incentive program influenced Dr. Fall's care and treatment decisions regarding Mr. Poteet, and hence should have been decided by the jury. The primary evidence provided by the Hospital to attempt to negate a cause in fact link on the bonus issue or to show that the Plaintiffs could not prove the same was a plainly self-serving affidavit by Dr. Fall denying any impact on his behavior or decision-making by the bonus incentive plan. As the Plaintiffs correctly have cited, "[s]ummary judgment is seldom appropriate in cases wherein particular states of mind are decisive as elements of claim or defense." *HCA, Inc. v. American Prot. Ins. Co.*, 174 S.W.3d 184, 193 (Tenn. Ct. App. 2005). Instead, it is the role of the jury to observe the demeanor of a witness when resolution of the dispositive issue requires determination of such witness's state of mind. *McDowell v. Moore*, 863 S.W.2d 418, 421 (Tenn. Ct. App. 1992). Furthermore, regardless of whether the Hospital's evidence was sufficient to switch the burden of production back to the Plaintiffs on the causation issue to avoid a summary judgment, the Plaintiffs nevertheless submitted sufficient competent evidence to demonstrate a genuine issue of material fact as to whether the bonus incentive plan affected Dr. Fall's treatment decisions to survive summary judgment. Testimony by the Plaintiffs' expert in hospital administration regarding the effect of such cost-saving bonus incentive plans and their relation to MRI usage rates, combined

with other expert testimony provided by the Plaintiffs, arguably could lead a jury to reasonably infer that the opportunity to receive a bonus, after having been informed that reduction of unnecessary diagnostic testing was a bonus criteria, had some impact on Dr. Fall's care and treatment decisions for Mr. Poteet. However, the Hospital is still entitled to judgment as a matter of law on the bonus incentive plan claim for a different reason.

Although the two grounds relied upon by the trial court – lack of both implementation and influence upon Dr. Fall's treatment decisions – may have been inappropriate to grant the Hospital partial summary judgment on the bonus incentive issue in light of the various forms of indirect evidence submitted by the Plaintiffs, in reviewing all the evidence and the record we nevertheless must uphold the partial summary judgment in favor of the Hospital. We reach this result based upon our conclusion that the bonus incentive issue cannot properly be characterized as a truly separable contributing cause in fact of Mr. Poteet's injury independent of any negligence by Dr. Fall. Since independent causation cannot be established on the issue and properly submitted for jury determination in light of the jury's finding of non-negligence by Dr. Fall, the Hospital is still entitled to a judgment as a matter of law since the Plaintiffs are unable to prove an essential element of their claim.

Assuming for the sake of argument that the bonus plan did in some way induce Dr. Fall at any point to not order an MRI for Mr. Poteet, subconsciously or otherwise, there still remains no genuine issue of material fact for a jury to consider or reconsider in a new trial, since there was no negligence by Dr. Fall as determined by the jury. Had any negligence been found on the part of Dr. Fall, for failure to order required diagnostic testing such as MRIs and/or failure to diagnose stroke earlier, the Hospital may well have been comparatively negligent by reason of the bonus incentive plan, the proportion of which appropriately would have been determined by the jury. In that case, a jury could reasonably infer that the bonus incentive plan that had been offered by the Hospital, whether officially implemented or not, was a contributing cause in fact and proximate cause of Mr. Poteet's injury by increasing the risk of a misdiagnosis or otherwise, to the extent that it influenced Dr. Fall's decision to not order an MRI sooner. However, under the facts of this case, no separate theory of independent cause in fact negligence can be linked to the Hospital on the basis of the bonus incentive plan alone, given the jury's exoneration of Dr. Fall in his care and treatment of Mr. Poteet. The jury found the decision-making by Dr. Fall regarding Mr. Poteet's treatment lacking in culpability and within the applicable standard of care. Consequently, whatever alleged influence the Hospital's bonus incentive plan had upon those treatment decisions became irrelevant and any genuine issue of material fact as to the bonus incentive plan's role in influencing those decisions was eliminated.

Once Dr. Fall's clinical judgment and treatment of Mr. Poteet was determined to be non-negligent and could no longer be attributed some proportionate degree of fault, no

further attempts to establish a cause in fact connection between the bonus incentive plan and Mr. Poteet's injury seriously can be entertained. The causation chain is broken since any liability to be assigned resulting from the bonus incentive plan necessarily is limited by the extent to which it influenced or caused any negligent treatment of Mr. Poteet by Dr. Fall. To find the Hospital negligent here for offering a bonus incentive plan that affected Dr. Fall's clinical judgment, when that same clinical judgment was found to be within the applicable standard of care, would plainly be an illogical result. Since no separate and independent causal link can be established between Mr. Poteet's injury and the bonus incentive plan offered to Dr. Fall as a matter of law, the trial court's stated grounds for granting the partial summary judgment were merely harmless error, and the partial summary judgment for the Hospital on the bonus incentive issue is affirmed.

**2.**

The Plaintiffs further argue a new trial is necessary since the evidence of the proposed bonus incentive plan, whether officially implemented or not, should not have been excluded by the trial court for their claim against Dr. Fall. The trial court granted Dr. Fall's motion in limine to exclude any evidence relating to the bonus incentive plan and it being offered to Dr. Fall on Tenn. R. Evid. 401, 402 and 403 relevancy grounds. While the incentive plan could conceivably be relevant in terms of the Hospital's liability for influencing Dr. Fall's decision-making process in treating Mr. Poteet, the relevancy of it in a medical malpractice claim against Dr. Fall is more difficult to discern. Regardless of whether or not Dr. Fall had a conscious or subconscious personal financial motive influencing his treatment of Mr. Poteet, such a non-clinical judgment motive had little or nothing to do with the issue of whether not ordering a particular diagnostic study was a violation of the appropriate standard of care. Even if we were to disagree with the trial court's judgment as to the bonus incentive plan's relevance and prejudicial effect, our standard of review for trial court decisions as to the admissibility of evidence on 401, 402, and 403 relevancy grounds is limited to "abuse of discretion." As our Supreme Court has stated, "the abuse of discretion standard does not permit the appellate court to substitute its judgment for that of the trial court." *Eldridge*, 42 S.W.3d at 85. Instead, a trial court's ruling "will be upheld as long as reasonable minds can disagree as to [the] propriety of the decision made." *Id.* In light of the wide latitude accorded to trial courts under the abuse of discretion standard, mere disagreement is insufficient to disturb a trial court's exclusion of proffered evidence. Beginning with "the presumption that the decision is correct" and "review[ing] the evidence in the light most favorable to the decision," the Plaintiffs are unable to satisfy their burden of establishing that the trial court abused its discretion in excluding any evidence or comment concerning the bonus incentive proposal.

**B.**

The Plaintiffs assert that the trial court erred in excluding portions of the testimony of their neurology expert, Dr. Lyden. Prior to trial, the Plaintiffs identified Dr. Lyden, a neurologist practicing in San Diego, California, as someone who would provide expert testimony. In response to motions in limine by the Defendants to exclude the expert's testimony altogether for violating Tenn. Code Ann. § 29-26-115(b)'s licensure requirement – Dr. Lyden has never practiced or been licensed to practice medicine in Tennessee or a contiguous state – the trial court decided to allow the witness to testify on certain limited issues as an explanatory or "education witness" providing general information on strokes. During Dr. Lyden's testimony, the trial court allowed him to answer general questions about stroke development. However, once the line of questioning started to veer into areas the trial court felt were outside the permissible scope of its ruling, the objections of the Defendants to the testimony were sustained.

Rulings on admissibility of evidence are within a trial court's discretion, and an appellate court will set aside such decisions "when the trial court has misconstrued or misapplied the controlling legal principles or has acted inconsistently with the substantial weight of evidence." *White v. Vanderbilt Univ.*, 21 S.W.3d 215, 222-23 (Tenn. Ct. App. 1999). We review the decision of the trial court to determine: "(1) whether the factual basis for the decision is supported by the evidence, (2) whether the trial court identified and applied the applicable legal principle, and (3) whether the trial court's decision is within the range of acceptable alternatives." *Id.* at 223. Improper admission or exclusion of evidence requires a new trial if the outcome of the trial was affected. Tenn. R. App. P. 36(b); *White*, 21 S.W.3d at 222.

As noted in *Farley v. Oak Ridge Medical Imaging, P.C.*, No. E2008-01731-COA-R3-CV, 2009 WL 2474742, at *8-9 (Tenn. Ct. App., E.S., August 13, 2009), the beginning point for the legal standards of a medical expert's qualifications is Tenn. Code Ann. § 29-26-115, which states in relevant part:

(a) In a malpractice action, the claimant shall have the burden of proving by evidence as provided in subsection (b):

(1) The recognized standard of acceptable professional practice in the profession and the specialty thereof, if any, that the defendant practices in the community in which the [defendant] practices or in a similar community at the time the alleged injury or wrongful action occurred;

(2) That the defendant acted with less than or failed to act with ordinary and

-34-

reasonable care in accordance with such standard; and

(3) As a proximate result of the defendant's negligent act or omission, the plaintiff suffered injuries which would not otherwise have occurred.

(b) No person in a health care profession requiring licensure under the laws of this state shall be competent to testify in any court of law to establish the facts required to be established by subsection (a), unless the person was licensed to practice in the state or a contiguous bordering state a profession or speciality which would make the person's expert testimony relevant to the issues in the case and had practiced this profession or speciality in one (1) of these states during the year preceding the date that the alleged injury or wrongful act occurred. . . .

Tenn. Code Ann. § 29-26-115 (2000). As indicated by this court in *Farley*, the three elements listed in subsection (a) of the statute must be proven by the testimony of a qualified expert. 2009 WL 2474742, at *9 (citing *Williams v. Baptist Memorial Hosp.*, 193 S.W.3d 545, 553 (Tenn. 2006)). Relying on *Russell v. Pakkala*,[5] No. 02A01-9703-CV-00053, 1998

---

[5]The *Russell* court's analysis was as follows:

[U]nder Tennessee Code Annotated § 29-26-115 (a)(3), there is no requirement that the medical expert be familiar with the standard for acceptable medical practice in the relevant community in order to testify as to causation. Regarding causation, the statute states:

(a) In a malpractice action, the claimant shall have the burden of proving by evidence as provided by subsection (b):

(3) as a proximate result of the defendant's negligent act or omission, the plaintiff suffered injuries which would not otherwise have occurred.

(b) No person in a health care profession requiring licensure under the laws of this state shall be competent to testify in any court of law to establish the facts required to be established by subsection (a) unless he was licensed to practice in the state or a contiguous bordering state a profession or speciality which would make his expert testimony relevant to the issues in the case and had practiced this profession or speciality in one of these states during the year preceding the date that the alleged injury or wrongful act occurred. Tenn. Code Ann. § 29-26-115(a)(3) and (b) (1980 & Supp. 1997).

The medical expert "must meet the licensing and geographic requirements of Section (b)" in order to be competent to testify as to causation. *Payne v. Caldwell*, 796 S.W.2d 142, 143 (Tenn. 1990). [The doctor] testified that he was licensed to practice medicine in Tennessee

(continued...)

WL 10212 (Tenn. Ct. App. W.S., Jan. 14, 1998), the decision of the *Farley* court further provides that a causation expert who does not testify on the standard of care is not required to establish familiarity with the standard of care (*see* Tenn. Code Ann. § 29-26-115(a)(1) – the "locality rule"). However, the court's opinion acknowledges that an expert on causation still must satisfy the Tenn. Code Ann. § 29-26-115(b) requirement that the expert be licensed to practice in Tennessee or a contiguous state and to have practiced in one of these states during the year preceding the occurrence of the alleged injury (the "licensure rule"). *See Payne v. Caldwell*, 796 S.W.2d 142, 143 (Tenn. 1990).

In the instant case, as noted above, Dr. Lyden has never practiced or been licensed to practice medicine in Tennessee or a contiguous state. Thus, allowance by the trial court of testimony beyond that given at trial would not have met the requirement of Tenn. Code Ann. § 29-26-115(b) that the expert be licensed to practice in Tennessee or a contiguous state and to have practiced in one of these states during the year preceding the occurrence of the alleged injury. A need to waive the requirement of the subsection was not established.

The Plaintiffs seek here de novo review with no presumption of correctness of the trial court's rulings on the testimony at issue as involving an interpretation of the medical malpractice statute, Tenn. Code Ann. § 29-26-115. *See Robinson v. LeCorps,* 83 S.W.3d 718, 722-23 (Tenn. 2002). While the Plaintiffs are correct as to the standard of review that would apply were we being called upon to re-interpret the state's medical malpractice statute, they are mistaken in their assumption that such a de novo interpretation of the trial court's evidentiary rulings is in order in this case. The Plaintiffs are really taking issue with the trial court's decisions as to what type of subject matter qualifies as causation. The trial court repeatedly sustained objections to any questions attempting to elicit opinions from Dr. Lyden that it considered as outside the limited scope of general information the witness was permitted to provide. Such discretionary decisions by the trial court concerning what constitutes causation-related matter do not directly involve any interpretation of statutory standards, and thus are subject to the much more limited abuse of discretion standard, rather than the de novo review sought by the Plaintiffs. As we discussed previously, under the

_____

[5](...continued)
and that he had practiced in Tennessee as a general surgeon for over twenty years. Thus, under the statute he was competent to testify to establish causation under subsection (a)(3), but not negligence under subsections (a)(1) and (2).

1998 WL 10212, at *5.

abuse of discretion standard, trial courts have broad discretion regarding the admission of expert testimony. Pursuant to our review of the rulings of the trial court regarding the testimony given by Dr. Lyden, we find no abuse of discretion.

## C.

The Plaintiffs' next assignment of error involves the special verdict form prepared for the jury by the trial court. The verdict form instructed the jurors that if the nurses and Dr. Fall were found to be not negligent, then the matter of the Hospital's alleged negligence for insufficient neurology coverage was to be disregarded. Since Dr. Fall and the nurses were found to be not negligent, the separate claim against the Hospital for insufficient neurology coverage was not addressed by the jurors. Accordingly, the Plaintiffs assert this omission by the jury created a defective verdict by failing to adjudicate one of the Plaintiffs' claims. They cited *Concrete Spaces, Inc. v. Sender,* which states a "new trial is required when the verdict form is composed in such a way which prevents the jury from adequately responding to each claim." 2 S.W.3d 901, 911 (Tenn. 1999).

After the questions and responses on the verdict form were read by the jury foreperson, the jury was polled, and all members of the jury indicated by raising their hands that the reported verdict was, in fact, their verdict. The trial court asked counsel to approach; at that time, counsel reviewed and signed the jury verdict form. At this conference, none of the parties' counsel requested anything else of the court, requested anything else from the jury, made any objection, or raised any concerns about the verdict form. As a result, the jury was released and discharged from its duty.

"Decisions regarding the use of a special verdict form and the questions to be included on the form are discretionary." *Ingram v. Earthman,* 993 S.W.2d 611, 640-41 (Tenn. Ct. App. 1998). However, a new trial is necessary "when the special verdict form is confusing or inconsistent with the trial court's instructions." *Id.* Reversal is necessary if the verdict form error "more probably than not affected the judgment." *Miller v. Choo Choo Partners, L.P.*, 73 S.W.3d 897, 908 (Tenn. Ct. App. 2001) (quoting Tenn. R. App. P. 36(b)).

As an initial matter, this issue is properly before us and was not waived by the Plaintiffs' failure to object earlier, despite the Defendants' arguments to the contrary that the Plaintiffs failed to preserve any alleged error of the jury verdict form in raising the issue after the jury had been discharged. As the Plaintiffs correctly have cited, the "Tennessee Rules of Civil Procedure provide that an objection to jury instructions is not waived where there is a failure to make objection until a motion for new trial." *Rolen v. Wood Presbyterian Home, Inc.*, 174 S.W.3d 158, 160-61 (Tenn. Ct. App. 2005) (citing Tenn. R. Civ. Proc.

51.02). In *Rolen*, we held that plaintiffs did not waive any disagreement with the jury verdict form by failing to timely object when they raised the issue in their motion for new trial, just as the Plaintiffs have done in this case. *Id.* Contrary to the case law upon which the Defendants rely that requires objection to the verdict form before jury discharge, we have repeatedly held to the contrary. *See, e.g., Whittemore v. Classen*, 808 S.W.2d 447, 458-59 (Tenn. Ct. App. 1991) (omission in jury verdict not called to attention of jury for resolution before discharged yet court remanded case for new trial). Therefore, the Plaintiffs' objections to the verdict form were raised appropriately in the motion for new trial and preserved for appeal.

Even if the special verdict form and the resulting failure of the jury to address the Hospital's liability for inadequate neurology coverage resulted in error, we nevertheless decline to award a new trial to the Plaintiffs. Jury instruction errors are only grounds for reversal or new trials when such errors actually affect the results of the trial. *See Vanderbilt Univ. v. Steely*, 566 S.W.2d 853, 854 (Tenn. 1978). Therefore, when the trial court subsequently granted the Hospital's Rule 50.02 motion for directed verdict on the insufficient neurology coverage claim, any alleged defects in the jury's verdict were cured or rendered moot and the Plaintiffs suffered no prejudice as a result of the allegedly erroneous incomplete verdict. Of course, were we to have reversed the directed verdict for the Hospital on the insufficient neurology coverage issue, then a further reconsideration of the alleged defective jury verdict might have been in order as well. However, since we have affirmed the trial court's directed verdict for the Hospital on the neurology coverage issue, as will be discussed below in the next section, then any further discussion of the verdict form objections would be purely dicta. Accordingly, any error associated with the jury verdict form is harmless causing no prejudice to the Plaintiffs, for which no setting aside of judgment and awarding of a new trial is necessary.

**D.**

The Plaintiffs have also challenged the granting by the trial court of the Hospital's post-trial Rule 50.02 motion for a directed verdict. At a hearing after the jury's verdict, the trial court found that the Plaintiffs had failed to provide the requisite expert proof to maintain their neurology coverage claim under the Tennessee malpractice statute, Tenn. Code Ann. § 29-26-115. Specifically, the Plaintiffs conceded the fact that they had not presented any expert witness testimony whatsoever to adequately establish both a standard of care applicable to the Hospital concerning neurology coverage – that is, what level of neurology coverage was required at a community hospital in a medical community like Cleveland, Tennessee in 2004 – and that the Hospital had deviated from this standard.

A trial court should grant a motion for judgment entered in accordance with a party's motion for a directed verdict under Rule 50.02 "only when the evidence is insufficient to create an issue for the jury to decide, or when reasonable minds can reach only one conclusion." *Plunk v. National Health Investors, Inc.*, 92 S.W.3d 409, 413 (Tenn. Ct. App. 2002) (citations omitted). Even if the facts are undisputed, the motion cannot be granted "when reasonable persons could draw conflicting conclusions from the facts." *Id.*

While we acknowledge our previous reservation in *Smartt v. NHC Healthcare/ McMinnville, LLC*, No. M2007-02026-COA-R3-CV, 2009 WL 482475, at *8 (Tenn. Ct. App. M.S., Feb. 24, 2009), as the Plaintiffs have appropriately cited, that an action against a hospital or other health or medical entity is not necessarily a per se medical malpractice claim, this cautionary language is of little help to the Plaintiffs' cause here in light of that case's holding as a whole. Indeed, in the preceding sentence of the *Smartt* holding, whose significance the Plaintiffs have apparently failed to discern, we declared that the medical malpractice statute is applicable "when a claim alleges negligent conduct which constitutes or bears a substantial relationship to the rendition of medical treatment by a medical profession . . . [c]onversely, when the conduct alleged is not substantially related to the rendition of medical treatment by a medical profession, the medical malpractice statute does not apply." *Id.* (quoting *Gunter v. Laboratory Corp. of Am.*, 121 S.W.3d 636, 641 (Tenn. 2003). We can scarcely imagine a plausible argument, nor have the Plaintiffs attempted one, that denies that the availability of a given medical specialist at a hospital, in this case a neurologist, is substantially related to the rendition of medical treatment by a medical profession. We are particularly inclined to find such a substantial relationship under the facts of this case in view of the multilateral and intertwined nature of Mr. Poteet's course of treatment, which, given his presenting condition and symptoms and pursuant to the Hospital's protocol, involved both discretionary and required consultations from multiple specialists, including a neurologist, acting in coordination with Dr. Fall as the primary treating physician.

Accordingly, we agree with the trial court's conclusion that the neurological coverage issue is not a general negligence "slip and fall" type claim against the Hospital, but one that is substantially related to the rendition of medical treatment by a medical profession giving rise to the medical malpractice statute requirements. Because the Plaintiffs failed to present any expert proof to establish either 1) what level of neurology coverage was required at a community hospital in a medical community like Cleveland, Tennessee in 2004; and 2) that the level of neurology coverage provided at the Hospital in 2004 failed to comply with the standard of care, their claim appropriately failed to survive a directed verdict for jury reconsideration in a new trial. Although the Plaintiffs did present some evidence of limited relevance in the form of various anecdotal expert testimony expressing preferences for some vague level of neurological coverage beyond what the Hospital was able to provide at that

time, by their own admission at no point were they able to satisfy the Tennessee malpractice statute's requirements by providing expert proof that directly spoke to the Hospital's level of neurological coverage as having violated an established standard of care. Since the Plaintiffs' evidence was insufficient legally to create an issue for the jury to decide pursuant to Tenn. Code Ann. § 29-26-115, the trial court did not commit error when it granted the Hospital's Rule 50.02 post-trial motion for directed verdict.

## E.

The Plaintiffs have requested this court to overturn the jury's verdict for lack of material evidence and are specifically challenging two of the jury's findings, one of which was that the nurses' violation of the applicable standard of care in their treatment and care of Mr. Poteet did not cause his injury. The jury found for the Plaintiffs on one or both of two alleged deviations from the standard of care. One deviation involved the nurses' non-compliance with the sedation interruption protocol order of Dr. Fall when they failed to interrupt Mr. Poteet's sedation prior to its being turned off at 11:00 a.m. on November 13; the other occurred when the nurses failed to adequately notify or communicate to Dr. Fall changes in Mr. Poteet's pupil reactivity and size. However, the jury apparently rejected the Plaintiffs' theories that these deviations caused Mr. Poteet's locked-in condition, and instead accepted evidence presented by the Hospital tending to show that the resulting injury would have occurred regardless of the inaction of the nurses.

Rule 13(d) of the Tennessee Rule of Appellate Procedure provides that "[f]indings of fact by a jury in civil actions shall be set aside only if there is no material evidence to support the verdict." Under this standard, an appellate court should "(1) take the strongest legitimate view of the evidence in favor of the verdict; (2) assume the truth of all evidence that supports the verdict; (3) allow all reasonable inferences to sustain the verdict; and (4) discard all [countervailing] evidence." *Whaley v. Perkins*, 197 S.W.3d 665, 671 (Tenn. 2006) (quoting *Barnes v. Goodyear Tire & Rubber Co.*, 48 S.W.3d 698, 704-05 (Tenn. 2000)).

While the Plaintiffs have presented competent evidence to support their theory of causation, the jury evidently found the Hospital's ample evidence, including compelling expert testimony, more credible and/or convincing. Such expert testimony included persuasive opinions that based on the clinical record Mr. Poteet was not having a stroke prior to 1 p.m. on November 13 when one of his pupils first became unresponsive, at which point he suffered a sudden and devastating stroke caused by a "traveling clot" and not a dissection of the vertebral artery; that there was no real evidence from the reports of any of Mr. Poteet's treating physicians while at the Hospital or from an arteriogram of any dissection in the vertebral artery to support the Plaintiffs' theory of a slowly developing stroke caused by clot

formation following the alleged arterial dissection; that sluggish or slightly unequal pupils are not an indication of stroke; and that based on an angiogram Mr. Poteet had unusual/abnormal anatomy in his vertebral artery that would have precluded his developing a clot in his left vertebral artery contrary to the dissection theory presented by the Plaintiffs. Clearly such abundant expert testimony evidence, found credible and accepted by the jury, more than satisfies the de minimus criterion of any "material evidence" to support a verdict. Accordingly, "tak[ing] the strongest legitimate view of th[is] evidence in favor of the verdict, assum[ing its] truth . . . , and allow[ing] all reasonable inferences. . . ." in its favor, we are unable to set aside the jury's finding that the nurses' inaction did not cause Mr. Poteet's condition.

**F.**

Similarly, the Plaintiffs also seek to overturn the jury's verdict for an asserted lack of material evidence to support the finding by the jurors that Dr. Fall's treatment and care of Mr. Poteet was within the applicable standard of care and not a negligent breach of said standard. They presented only one expert to support their claims – Dr. Salzman, an internist specializing in pulmonary and critical care medicine from Kansas City, Missouri. Dr. Salzman conceded during cross-examination that he does not specialize in the field of neurology or stroke treatment.

Despite the Plaintiffs' contentions to the contrary, we find the ample material evidence provided by the Defendants and demonstrated in the record more than sufficient to sustain the jury's finding of no negligence on the part of Dr. Fall. The Defendants' expert witnesses testified that the standard of care relative to the medical treatment of Mr. Poteet given his presenting condition was to control Mr. Poteet's seizures, monitor him, and make adjustments as his condition changed, and that Dr. Fall followed these standards; that there was no evidence to suspect Mr. Poteet had suffered or was developing a stroke prior to the time Dr. Fall diagnosed the stroke at 1:00 p.m. on November 13, so obtaining additional diagnostic studies or transferring him before that point was neither clinically indicated nor required under the appropriate standard of care; and that Dr. Fall's diagnosis for Mr. Poteet of seizure condition due to alcohol withdrawal preceding his stroke diagnosis at 1:00 p.m. on November 13 was an appropriate diagnosis. Significantly, when the neurologist examined Mr. Poteet, she arrived at the same diagnosis as Dr. Fall and did not order further diagnostic studies or a transfer.

Given the abundant persuasive evidence provided by the Defendants, including the foregoing expert testimony presumably found credible and convincing by the jury, we are unable to conclude that such evidence cumulatively falls short of the minimal materiality requirement to sustain a jury's findings and verdict. For us to attempt to re-weigh the

evidence or make independent credibility determinations would far exceed the appropriately highly limited scope of our appellate review of jury findings. Accordingly, we uphold the jury's conclusion that Dr. Fall was not negligent and did not deviate from the applicable standard of care in his treatment of Mr. Poteet.

## G.

The Plaintiffs additionally argue a new trial is warranted on the grounds that the trial court abused its discretion in denying their motion for new trial, having misconstrued or otherwise failed to properly perform its duties as a thirteenth juror in reevaluating the evidence and reaching an independent determination.

A trial court is given wide latitude in granting a motion for a new trial as the thirteenth juror, and appellate courts will not overturn such decision unless there has been an abuse of discretion. *See Miller v. Doe*, 873 S.W.2d 346 (Tenn. Ct. App. 1993). When acting as the thirteenth juror in considering a motion for new trial, the trial court must independently weigh the evidence, determine the issues presented, and decide whether the jury's verdict is supported by the evidence. *See Overstreet v. Shoney's Inc.*, 4 S.W.3d 694, 717 (Tenn. Ct. App. 1999). If, after weighing the evidence, the trial court is satisfied with the jury's verdict, it must approve the verdict. *See Ridings v. Norfolk Southern Ry. Co.*, 894 S.W.2d 281, 288 (Tenn. Ct. App. 1994). However, if a trial court's comments on the record in the course of reviewing a motion for new trial "indicate that the trial court misconstrued its duty as a thirteenth juror, and has approved the verdict for some reason other than its own satisfaction with the verdict based upon an independent evaluation of the evidence," it is our responsibility "to reverse and remand the case for a new trial." *Id.* at 289. On the other hand, we will presume the trial court properly performed its duty as the thirteenth juror when the trial court approves the jury's verdict without comment. *See Ridings*, 894 S.W. 2d at 289; *Dickey v. McCord*, 63 S.W.3d 714, 718 (Tenn. Ct. App. 2001).

The Plaintiffs have failed to point to any language of the trial court in the record to support their contention that the court misconstrued its thirteenth juror independent evaluation duties. Instead, the Plaintiffs have merely repeated in summary fashion the evidence they already discussed at length involving their challenges to the jury's verdict itself.

Even assuming we were inclined to perceive the evidence as weighing more favorably for the Plaintiffs, we would not be at liberty to overturn the jury's verdict and order a new trial. Indeed, such an independent re-weighing would clearly be outside of the permissible scope of review of a trial court's decision as a thirteenth juror, in which we would effectively

be usurping the role of the thirteenth juror ourselves. Instead our ability to reverse a trial court's approval or denial of a new trial as a thirteenth juror is strictly limited to cases of manifest abuse of its broad discretion, as clearly demonstrated by the trial court's comments or discussion of its decision regarding the motion for new trial. If, however, the trial court provides no such comments or discussion, or else merely recites the appropriate legal standard to apply in announcing its decision on a motion for a new trial, e.g. that it has "made an independent examination of the evidence presented and conclude[s] that it preponderates in favor of the verdict of the jury and consequently overrule[s] the motion," we must assume the trial court appropriately exercised its function as the thirteenth juror. *Hatcher v. Dickman*, 700 S.W.2d 898, 900 (Tenn. Ct. App. 1985). In the case at bar, the trial court stated that "I have made a very thorough and independent review of all the evidence and the law in this trial, and I find specifically that the evidence preponderates in favor of the jury's verdict. . . ." Accordingly, we cannot conclude that trial court abused its discretion in its role as the thirteenth juror in finding the evidence supports the jury's verdict.

## H.

Finally, the Plaintiffs contend the trial court abused its discretion in awarding discretionary costs to the Defendants. Their primary challenge to the award relies on the equities involved in awarding discretionary costs to the Defendants in light of Mr. Poteet's medical and financial condition.

When deciding whether to award discretionary costs, a court should "(1) determine whether the party requesting the costs is the 'prevailing party,' (2) limit awards to the costs specifically identified in the rule, (3) determine whether the requested costs are necessary and reasonable, and (4) determine whether the prevailing party has engaged in conduct during the litigation that warrants depriving it of the discretionary costs to which it might otherwise be entitled." *Massachusetts Mut. Life Ins. Co. v. Jefferson*, 104 S.W.3d 13, 35-36 (Tenn. Ct. App. 2002). The decision to award costs should not be based on "(1) a desire to punish the losing party, (2) whether the prevailing party is the plaintiff or defendant, or (3) the weight given to a particular witness's testimony." *Id.* at 36. The party seeking such costs has the burden of demonstrating its entitlement to the costs. *Id.* "Pursuant to Rule 54.04, trial courts are vested with wide discretion in awarding discretionary costs, and this court will not interfere with such an award except on an affirmative showing that the trial court abused its discretion." *Sanders v. Gray*, 989 S.W.2d 343, 345 (Tenn. Ct. App. 1999). An award of costs under Rule 54.04(2) is within the trial court's reasonable discretion, and the court may allocate such costs "between the litigants as . . . the equities demand." *Perdue v. Green Branch Mining Co.*, 837 S.W.2d 56, 60 (Tenn. 1992); *Progressive Cas. Ins. Co. v. Chapin*,

243 S.W.3d 553, 561 (Tenn. Ct. App. 2007); *Massachusetts Mut. Life Ins. Co.*, 104 S.W.3d at 35.

In light of such broad discretion, we employ "a deferential standard when reviewing a trial court's decision either to grant or to deny a motion pursuant to this rule." *Smartt v. NHC Healthcare/McMinnville, LLC*, 2009 WL 482475 at *31; *see also Scholz v. S.B. Int'l., Inc.*, 40 S.W.3d 78, 84 (Tenn. Ct. App. 2000). "Because these decisions are discretionary, this court is generally disinclined to second-guess a trial court's decision unless the trial court has abused its discretion. *Smartt*, 2009 WL 482475 at *31; *see also Woodlawn Mem'l Park, Inc. v. Keith*, 70 S.W.3d 691, 698 (Tenn. 2002). On appeal, the appellant bears the burden of showing the trial court abused its discretion in its assessment of costs. *See Sanders*, 989 S.W.2d at 345.

We have repeatedly held, in accord with Tennessee Supreme Court mandate, that mere inability to pay or indigency is not an "extraordinary matter" warranting review of a trial court's discretionary award of costs. *See Roberts v. Blount Mem'l Hosp.*, 963 S.W.2d 744, 749 (Tenn. Ct. App. 1997) (quoting *Lewis v. Bowers*, 392 S.W.2d 819 (Tenn. 1965)). While we acknowledge Mr. Poteet's tragic condition and its associated permanent financial burden present complications that tend to weigh in favor of not assessing costs against the Plaintiffs, we nevertheless cannot say that the trial court's imposition of such costs constitutes a "manifest abuse of discretion." *Id.* The Plaintiffs have not met their substantial burden of establishing that there is "no equitable basis upon which to support the trial court's apportionment of costs and that the trial court clearly abused its wide discretion in awarding such costs." *See Sanders*, 989 S.W.2d at 345; *Chaffin v. Ellis*, 211 S.W.3d 264, 293 (Tenn. Ct. App. 2006). Therefore, even if we were to find a different outcome more appropriate or preferable under the circumstances, in the absence of an affirmative showing of a clear manifest abuse of the trial court's wide discretion, we are unable to second-guess the court's decision or interfere with its award of discretionary costs to the Defendants.

## IV. CONCLUSION

The judgment of the trial court is affirmed. Costs on appeal are taxed to the appellants, Bennie Joe Poteet, II, individually and by and through Evelyn Poteet, as his conservator. This case is remanded, pursuant to applicable law, for collection of costs assessed below.

_____
JOHN W. McCLARTY, JUDGE

-44-